# United States Bankruptcy Appellate Panel

## For the Eighth Circuit

_____

No. 13-6013

_____

In re: Robert N. Armstrong

*Debtor*

------------------------------

Bank of America, N.A

*Plaintiff - Appellee*

v.

Robert N. Armstrong

*Defendant - Appellant*

_____

Appeal from United States Bankruptcy Court
for the Eastern District of Missouri - St. Louis

_____

Submitted:  July 17, 2013
Filed:  September 19, 2013

_____

Before FEDERMAN, Chief Judge, SHODEEN and NAIL, Bankruptcy Judges.

FEDERMAN, Chief Judge

Debtor Robert N. Armstrong appeals from the Order of the Bankruptcy Court[1] finding his debt to Bank of America nondischargeable under 11 U.S.C. § 523(a)(2) for fraud and § 523(a)(4) for embezzlement.  For the reasons that follow, the Judgment finding the debt nondischargeable under § 523(a)(4) is AFFIRMED.

## FACTUAL BACKGROUND

Debtor Robert N. Armstrong was the owner, sole member, and primary manager of RNA Properties, LLC.  In August 2001, RNA Properties acquired a strip mall in Dallas, Texas though financing from Southwest Bank.  The financing came from two loans, one in the amount of $1.6 million, and a second in the amount of $400,000.  The first note was secured by a Deed of Trust on the mall.  As relevant here, the Deed of Trust required RNA Properties to list Southwest Bank as the loss payee on its insurance policies.  The mall was insured by Public Service Mutual Insurance Company ("PSM"), but the policy listed Southwest as the mortgage holder, rather than as a loss payee as was required under the loan documents.

On January 25, 2009, a fire destroyed one of the three structures at the mall.  PSM issued nine checks under the policy, totaling $917,149.26, made payable to the Debtor d/b/a RNA Properties.  The Debtor endorsed and deposited all of the checks.

At issue here are three of those insurance checks in the amounts of $80,000, $50,000, and $5,500 – totaling $135,500 – which were made jointly payable to "Robert Armstrong d/b/a RNA Properties LLC and Southwest Bank, An M&I Bank, ISAOA" (the "Three Checks").  The first two checks, for $80,000 and $50,000, respectively, were dated February 12, 2009, and were deposited into RNA Properties LLC's account at Bank of America on February 13, 2009.  The third check, for $5,500, was dated May 26, 2009, and was deposited into RNA

---

[1] The Honorable Kathy A. Surratt-States, United States Bankruptcy Judge for the Eastern District of Missouri.

Properties' account on June 1, 2009. All three checks were deposited into RNA Properties' account without Southwest's endorsement, despite the fact that Southwest was a co-payee on each of the checks.

The Debtor used less than $5,000 of the funds from the Three Checks to make repairs to a portion of the mall. Instead, the Debtor diverted the majority of the funds to his personal use. Shortly after depositing the funds into the RNA Properties account, the Debtor caused $100,000 of the money to be transferred to his and his wife's personal bank account. The Debtor's wife then wrote two checks dated February 17, 2009 from their personal account – one for $70,000 to pay down their home equity line of credit, and a second check for $30,000 which was deposited into their personal savings account. The Debtor admitted he used the insurance proceeds for personal or other business issues at his sole discretion. Indeed, despite being paid over $900,000 in total insurance proceeds, there was no work started at the mall, except for some cleanup and $4,863.39 in minor repairs to the adjoining building's roof.

Meanwhile, despite being required to do so under the loan documents, the Debtor never informed Southwest of the fire or of any of the insurance checks. Instead, he continued to make the regular payments on the loans to Southwest and pay property taxes. Southwest learned of the fire sometime around August to October 2009, from another source or from a routine inspection of the property. On December 9, 2009, Southwest declared the notes in default and made demand for payment of approximately $1.6 million under the two notes. The Debtor paid Southwest $400,000 from six different personal accounts in response to the demand, but Southwest foreclosed on the mall in February 2010. PSM sued the Debtor, RNA Properties, and Southwest Bank in the District Court of Dallas County, Texas. Bank of America was joined by Southwest as a third-party defendant in relation to the Three Checks. Bank of America filed a cross-claim against the Debtor and RNA Properties. On April 2, 2011, Bank of America and Southwest settled Southwest's claim for negotiating the unendorsed checks. As part of that settlement, Bank of America paid Southwest the $135,500 represented by the Three Checks. The Order of Dismissal of Bank of America expressly preserved any claims by Bank of America against the Debtor and RNA Properties.

The Debtor filed a Chapter 7 bankruptcy case on October 28, 2011, staying the state court litigation. Bank of America filed a proof of claim in the Debtor's bankruptcy case, based on the Three Checks. Bank of America also sought denial of the discharge of the debt pursuant to § 523(a)(2)(A), (a)(4), and (a)(6) of the Bankruptcy Code.

On cross motions for summary judgment, the Bankruptcy Court held in favor of Bank of America, finding that the debt was excepted from the Debtor's discharge under § 523(a)(2)(A) for fraud, as well as embezzlement under § 523(a)(4) of the Code. The Debtor appeals.

## STANDARD OF REVIEW

We review the Bankruptcy Court's grant of summary judgment *de novo*.[2] Summary judgment is appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[3] The Bankruptcy Court is not to weigh evidence and make credibility determinations, or to attempt to determine the truth of the matter, but is, rather, solely to determine whether there is a genuine issue of fact for trial.[4] The Court is to view the facts in a light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from that evidence.[5] "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient

---

[2] *Williams v. Marlar* (*In re Marlar*), 252 B.R. 743, 750 (B.A.P. 8th Cir. 2000) (citations omitted).

[3] *Id.* (citations omitted); Fed. R. Civ. P. 56(c), made applicable here by Fed. R. Bankr. P. 7056.

[4] *Id.* (citations omitted).

[5] *Id.* (citations omitted).

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[6]

Because we conclude that the Bankruptcy Court did not err in finding the debt to be nondischargeable under § 523(a)(4) for embezzlement, we limit our analysis to that basis for nondischargeability. As a result, we do not reach the § 523(a)(2)(A) fraud issue.

DISCUSSION

Section 523(a)(4) of the Bankruptcy Code provides that a discharge under § 727 "does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[7] "Embezzlement, for purposes of section 523(a)(4), is the fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come."[8] "A plaintiff must establish that the debtor was not lawfully entitled to use the funds for the purposes for which they were in fact used."[9]

"To show embezzlement, the creditor has to prove that it entrusted its property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud."[10] Courts often examine whether the terms by which a debtor came into possession of the funds

---

[6] *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)).

[7] 11 U.S.C. § 523(a)(4).

[8] *In re Phillips*, 882 F.2d 302, 304 (8th Cir. 1989) (quoting *In re Belfry*, 862 F.2d 661, 662 (8th Cir.1988)) (internal brackets and quotation marks omitted).

[9] *In re Belfry*, 862 F.2d 661, 662 (8th Cir. 1988).

[10] *Hamilton v. Green* (*In re Green*), 2012 WL 3028462 at *4 (Bankr. W.D. Mo. 2012) (slip copy) (citation omitted).

create an obligation on the debtor.[11]  "Obligations sufficient to support a claim of embezzlement are ones which make the debtor's discretionary use of the payment, prior to complying with the obligations, improper."[12]

First, the Debtor asserts that the Bankruptcy Court erred in finding that Bank of America proved standing to pursue a claim under § 523(a)(4) because Bank of America did not plead or prove that the Debtor embezzled funds from it, as opposed to Southwest Bank.  Rather, the Debtor asserts, his debt to Bank of America is based on breach of the presentment warranty under § 3.417 of the Uniform Commercial Code and the Texas UCC (for depositing the checks without Southwest Bank's endorsement), not embezzlement.  He further asserts that Bank of America could not pursue this cause of action on behalf of Southwest Bank because there were no contractual subrogation rights between the two banks.

To the contrary, however, the Debtor expressly stipulated that Bank of America was subrogated to Southwest's claims against him.[13]  Since Bank of America is subrogated to Southwest, and stands in the shoes of Southwest,[14] this cause of action for embezzlement is not based on a breach of the presentment warranty to Bank of America; rather, it is based on the Debtor's use of funds in which Southwest Bank claimed an interest.  Bank of America does, therefore, have standing to pursue the embezzlement claim.

Next, pointing out that "[o]ne cannot embezzle one's own property,"[15] the Debtor asserts that the Court erred when it found he had no ownership interest in

---

[11]  *In re Belfry*, 862 F.2d at 663.

[12]  *Id.* (citation omitted).

[13]  *See, e.g., Stipulation of Certain Undisputed Facts Between Bank of America, N.A. and Robert N. Armstrong* at ¶¶ 30 and 48, Adversary No. 12-4045 (Bankr. E.D. Mo. Jan. 10, 2013), ECF No. 41.

[14]  The term "subrogate" means "[t]o substitute (a person) for another regarding a legal right or claim."  Black's Law Dictionary (9th ed. 2009).

[15]  *In re Belfry*, 862 F.2d at 662.

the insurance proceeds and that he had, therefore, fraudulently appropriated the funds of another. Further, the Debtor asserts, a borrower cannot embezzle funds which are proceeds of a creditor's collateral, because the borrower retains an ownership interest in the collateral subject to the creditor's security interest.[16] The Debtor asserts that he owned the mall property, and thus the insurance proceeds, which were merely pledged as collateral for the loan by Southwest Bank.

The Bankruptcy Court held that Southwest Bank was the owner of the insurance proceeds because (i) the Deed of Trust specifically stated that Southwest Bank was to be the loss payee of any insurance policy concerning the mall; (ii) RNA Properties, "by way of Debtor," was required to immediately inform Southwest Bank of any insurance claim; (iii) the Deed of Trust called for all insurance proceeds to be paid directly to Southwest Bank rather than to Southwest Bank and RNA Properties jointly; (iv) the Deed of Trust stated that Southwest Bank had the power to endorse any check that was jointly payable to Debtor and Southwest Bank; and, "most importantly," (v) the Deed of Trust stated that, "[Southwest] Bank shall have the right, as its sole option, to apply all such monies as shall be thus collected and received [from insurance proceeds]... toward the payment of the Secured Indebtedness of the cost of rebuilding or restoring the damaged property ... or to apply all or any part of such monies against any part of the Secured Indebtedness, without regard to the maturity thereof, and in any order as Bank shall elect."

Based on this language in the Deed of Trust, the Bankruptcy Court held that neither the Debtor nor RNA Properties had any ownership interest in the insurance proceeds, particularly the Three Checks. Rather, the Court held, Southwest Bank held more than a mere security interest in the proceeds – it owned them.

In so holding, the Bankruptcy Court acknowledged, but distinguished, the contrary conclusion reached by the Eighth Circuit in *In re Phillips*.[17] In that case, the debtors were officers and shareholders of Midwest Poultry Equipment, Inc.

---

[16] *See In re Phillips*, 882 F.2d at 304.
[17] 882 F.2d 302 (8th Cir. 1989).

Midwest granted First National Bank of Fayetteville (FNB) a security interest in proceeds owed to the company under a lease. Although Midwest had instructed the funding bank to make the check for the lease payable jointly to Midwest and FNB, the bank made the check payable only to Midwest. Midwest deposited the check directly into its general funding account. After the debtors (who were Midwest's officers and directors), learned of the mistake, they did nothing to correct the problem and did not notify FNB of it. When the debtors filed bankruptcy, FNB alleged that the debtors had embezzled the funds. Notably, although some of the funds were used to pay corporate debts which the officers (debtors) had guaranteed, the debtors did not themselves walk off with the funds; instead, they kept the funds for their corporation without paying them over to the bank. The Eighth Circuit held that, despite certain "assignment" language in the loan documents, Midwest owned the funds subject only to FNB's security interest.

Crucially, what no one has fully appreciated in our case thus far is the distinction between the Debtor and RNA Properties LLC as separate entities. The Eighth Circuit did not acknowledge the distinction in *Phillips*, either, apparently because it had concluded that FNB, as the holder of a security interest, had no ownership interest in the money to the exclusion of the owner/borrower (Midwest), under the loan documents there.

Here, regardless of whether *RNA Properties* had an ownership interest in the insurance proceeds to the exclusion of Southwest (as was the case in *Phillips*), there is nothing in the record at all suggesting that *the Debtor* had any ownership interest in mall property or the insurance proceeds.[18] The Debtor's repeated unsupported statements in pleadings that he owned the property are perplexing.

---

[18] For instance, the Deed of Trust identifies the "Borrower" as "RNA Properties LLC A/K/A RNA Properties, L.L.C." and warrants that "Borrower is lawfully seized of indefeasible title and estate to the Mortgaged Property. . . ." The Debtor signed the Deed of Trust on behalf of RNA Properties, but he is not a party to it.

We held in *In re Potts* that there could be "no doubt" that a contractual co-payee of a check has an interest in the funds represented by the check.[19] Similarly here, there can be no doubt that, under the terms of the Deed of Trust and as co-payee of the Three Checks, Southwest had an interest in the funds represented by the Three Checks. Consequently, since the Debtor had no ownership interest in the insurance proceeds, he either took money which was owned outright by Southwest (as the Bankruptcy Court held), or he took money that was owned by RNA Properties, subject to a lien in favor of Southwest Bank. Either way, in contrast to *Phillips* – where the debtors themselves were not alleged to have taken the money – the Debtor here did misappropriate "property of another."

The gloss over the distinction between the Debtor and RNA Properties is also relevant on the question of whether the Debtor initially came into possession of the funds lawfully, one of the elements of embezzlement. As stated, the Three Checks were made payable to Robert Armstrong d/b/a RNA Properties and Southwest Bank.[20] This is likely because, for some reason, the insurance policy itself appears to have been issued to Robert Armstrong d/b/a RNA Properties LLC,[21] even though the Debtor had no ownership interest in the mall property.

---

[19] 469 B.R. 310, 313 (B.A.P. 8th Cir. 2012). *See also Option One Mortgage Corp. v. Fitzgerald*, 687 F.Supp.2d 520, 525 (M.D. Pa. 2009) (holding that, where the plaintiff was a named co-payee on a check, and the mortgage agreement provided that the defendants were obligated to turn the check over to the plaintiff, the plaintiff's right in an insurance check vested at the time it was issued, and the defendants had no rights in the check without plaintiff's endorsement).

[20] Similarly, all of the other insurance checks were made payable to Robert Armstrong d/b/a RNA Properties LLC.

[21] *See Affidavit of Jeffrey T. Bannon in Support of Public Service Mutual Insurance Company's Application for Temporary Restraining Order and Temporary Injunction* at ¶ 2, attached as *Exhibit A* to *Affidavit of Rupert Baron*, Adversary No. 12-4045 (Bankr. E.D. Mo. Nov. 21, 2012), ECF No. 27-4; and *Exhibit B* to *Defendant's Reply to Bank of America's Response to Motion for Summary Judgment*, Adversary No. 12-4045 (Bankr. E.D. Mo. Nov. 27, 2012) ECF No. 31.

Because the Debtor had no ownership interest in the mall property, neither the insurance policy nor any of the checks from it should have been issued to the Debtor. Nevertheless, because the checks were issued to the Debtor, we conclude that he came into possession of the funds lawfully. But even if that were not the case, the only difference between a nondischargeable debt for embezzlement and a nondischargeable debt for larceny under § 523(a)(4) is whether the initial possession of the property was lawful.[22] While we conclude that the Debtor's initial possession of the Three Checks was lawful, if it was not, his taking of the money was larceny. Either way, the debt is nondischargeable under § 523(a)(4).

The Debtor next asserts that the Bankruptcy Court erred in finding fraudulent intent. While the Bankruptcy Court's findings on this element of § 523(a)(4) were scant, the undisputed facts amply support a finding of intent.

A debtor's fraudulent intent for purposes of § 523(a)(4) may be, and often must be, shown by circumstantial evidence.[23] Here, the undisputed and indisputable facts include the following circumstantial evidence of the Debtor's fraudulent intent: (i) the Debtor failed to disclose the fire to Southwest, despite the obvious requirement in the loan documents that he do so; (ii) the Debtor failed to disclose to Southwest that he had made an insurance claim or that he had received over $900,000 in insurance proceeds, despite the requirement in the loan documents that he do so, and despite the fact that the loan documents required payment of any insurance proceeds be made to Southwest Bank to be applied at its sole discretion; (iii) the Debtor deposited the checks without Southwest's endorsement or approval, despite the fact that the loan documents required

---

[22] *Treadwell v. Glenstone Lodge, Inc.* (*In re Treadwell*), 459 B.R. 394, 406 (Bankr. W.D. Mo. 2011) (quoting 4 Collier on Bankruptcy ¶ 523.10[2] (15th ed. Rev.) ("In short, section 523(a)(4) excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the appropriation was unlawful at the outset, and therefore a larceny, or whether the appropriation took place unlawfully after the property was entrusted to the debtor's care, and therefore was an embezzlement.").

[23] *See Kruse v. Murray* (*In re Murray*), 408 B.R. 268, 275 (Bankr. W.D. Mo. 2009).

Southwest's approval, Southwest's endorsement was clearly required on the checks as they were made jointly payable, and despite the fact that the deposit without the endorsement was in contravention of Texas law; (iv) the Debtor immediately diverted the money from RNA Properties' bank account and used the money for personal and other business purposes at his sole discretion, despite the fact that the loan documents authorized only Southwest Bank to apply the proceeds at its own discretion; and (v) RNA Properties, which was controlled by the Debtor, made almost no repairs to mall.

We recognize that fraudulent intent is ordinarily a question to be determined by the fact-finder and is difficult to demonstrate on a motion for summary judgment.[24] However, when the "unmistakable picture painted by . . . stipulation" establishes fraudulent intent, summary judgment is appropriate.[25]

Based on the foregoing undisputed circumstantial evidence, Bank of America met its initial burden of showing no genuine issue of material fact that the Debtor took the money with fraudulent intent. That being the case, the Debtor was required to "advance specific facts to create a genuine issue of material fact for trial."[26] While the Debtor generally asserted in responses to discovery and in pleadings that he was not aware of any of loan documents' requirements to notify Southwest of anything, or of his obligation to obtain Southwest's endorsement on

---

[24] *See Jackson v. Star Sprinkler Corp. of Florida*, 575 F.2d 1223, 1231 (8th Cir. 1978). *See also Thoms v. Vucurevich* (*In re Vucurevich*), 2013 WL 662688 (Bankr. D. S.D. Feb. 25, 2013) ("Where motive and intent are at issue, disposition of the matter by summary judgment may be more difficult.").

[25] *Id*. at 1234 (finding that the stipulated facts in that case left no material issue of fact remaining and that those facts established as a matter of law that the transfer at issue was made with intent to hinder, delay, and defraud creditors).

[26] *F.D.I.C. v. Bell*, 106 F.3d 258, 263 (8th Cir. 1997) ("Mere arguments or allegations are insufficient to defeat a properly supported motion for summary judgment; a 'nonmovant must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial.") (citation omitted).

11

checks which were made payable to Southwest, and that he had done so in the past, he pointed to no "specific facts" to support those claims.[27] Moreover, that assertion in light of the facts defies common sense.

In sum, the in order to prevail under § 523(a)(4), "[a] plaintiff must establish that the debtor was not lawfully entitled to use the funds for the purposes for which they were in fact used."[28] Southwest Bank established that the Debtor was not lawfully entitled to use the insurance proceeds for the purposes for which he used them and the Debtor has produced nothing to the contrary.

ACCORDINGLY, the Order of the Bankruptcy Court finding the Debtor's debt to Bank of America, as subrogee to Southwest Bank, to be nondischargeable under 11 U.S.C. § 523(a)(4) is AFFIRMED.

———————————————

---

[27] The Debtor's attempt to offer evidence of specific instances of consistent conduct in the past for the first time on appeal is not appropriate. *McCleary v. ReliaStar Life Ins. Co.*, 682 F.3d 1116, 1120 (8th Cir. 2012) ("Our review of the evidence includes only the record that was before the [Bankruptcy Court] when it ruled on the summary judgment motion.").

[28] *In re Belfry*, 862 F.2d at 662.